UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


FREDERICK LEE WADE,

      Petitioner,

v.                                                          Case No. 3:23-cv-29-MMH-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## ORDER

### I. Status

Petitioner Frederick Lee Wade, an inmate of the Florida penal system, filed an Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 and a supporting memorandum. (Doc. 7).[1] Wade challenges a 2011 state court judgment of conviction for second-degree murder in Duval County, Florida, and raises five grounds for relief. Respondents submitted a memorandum in opposition to the Amended Petition supported by exhibits. (Doc. 12). Wade did not file a reply. This action is ripe for review.

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

## II. Relevant Procedural History

After a jury found Wade guilty of second-degree murder, the state appellate court reversed his conviction and remanded the case for a new trial. Wade v. State, 155 So. 3d 1257 (Fla. 1st DCA 2015). The state appellate court determined that the trial judge failed to instruct the jury on a necessary lesser included offense. Wade, 155 So. 3d at 1258. A second jury found Wade guilty of second-degree murder, and the trial judge sentenced Wade to forty-five years in prison with a twenty-five-year mandatory minimum term for use of a firearm during the offense. (Doc. 12-2 at 147–48, 183–89).

Wade appealed the conviction and sentence, and the state appellate court affirmed in a decision without a written opinion. (Doc. 12-7 at 3). Wade filed an amended motion for post-conviction relief under Rule 3.850, Florida Rules of Criminal Procedure, (Doc. 12-8 at 13–30), the post-conviction court denied the amended motion without an evidentiary hearing (Doc. 12-8 at 31–43), and the state appellate court affirmed in a decision without a written opinion. (Doc. 12-17 at 3).[2] Wade's federal petition followed.

---

[2] The state appellate court initially dismissed Wade's post-conviction appeal as untimely. The state supreme court granted Wade's petition for a writ of mandamus and directed the state appellate court to reinstate the post-conviction appeal. Wade v. State, 334 So. 3d 600 (Fla. 2022).

2

At trial, the prosecutor presented the following evidence. On June 21, 2011, in the afternoon, a deputy sheriff traveled to a wooded area in Jacksonville, Florida, because a person discovered a body. (Doc. 12-3 at 59). The deputy observed a young black female face down on the ground. (Doc. 12-3 at 60, 69). The body was that of Kalil McCoy. (Doc. 12-3 at 57–58).

On June 19, 2011, in the evening, McCoy went with her friends to a nightclub and then went to a park after the nightclub closed. (Doc. 12-3 at 76, 83). At the park, McCoy and her friends met Kennard Mahone, Alfred Mears, and Jonathan Brooks. (Doc. 12-3 at 77, 83). McCoy and Mahone drank alcohol at the park, and McCoy stayed with Mahone after her friends left the park. (Doc. 12-3 at 84, 87).

Mears testified at the trial. He stated that Mahone was his stepbrother, that he knew Brooks from high school, and that he knew Wade from childhood. (Doc. 12-3 at 89–90). He testified that, on June 19, 2011, he, Mahone, and Brooks met McCoy and Wade at the nightclub, (Doc. 12-3 at 91–92), and that, at 2:00 A.M., when the nightclub closed, the group went to the park, (Doc. 12-3 at 93). According to Mears, after spending time at the park, he rode with Mahone to return a car that belonged to the mother of Mahone's child. (Doc.

3

12-3 at 92, 94). Wade, Brooks, and McCoy followed him in Wade's truck. (Doc. 12-3 at 94–95).

After Mahone returned the car, both Mahone and Mears entered Wade's truck. (Doc. 12-3 at 95). Wade sat in the driver's seat, McCoy sat in the front passenger seat, and Mears, Mahone, and Brooks sat in the back seat. (Doc. 12-3 at 96). Mears heard McCoy and Wade arguing because McCoy had rolled down the front passenger window of Wade's truck in front of the home where the mother of Mahone's child lived. (Doc. 12-3 at 95–96). When the argument between Wade and McCoy escalated, Wade pulled out a gun and pointed the gun at McCoy. (Doc. 12-3 at 97–98). Mears observed the gun discharge, when Wade stopped his truck at a traffic light. (Doc. 12-3 at 98–99). Mears denied observing McCoy reach for the gun. (Doc. 12-3 at 99).

Mears testified that, after the shooting, when he told Wade to go to the hospital, Wade panicked and started to drive at a dangerous speed down the road. (Doc. 12-3 at 99). Wade drove his truck to the end of a dead-end street and asked Mears, Mahone, and Brooks to help him move McCoy's body. (Doc. 12-3 at 101–02). He testified that Wade and Brooks dumped McCoy's body in nearby woods and that he placed her purse next to a tree. (Doc. 12-3 at 102).

4

Mears testified that he did not call the police because he was scared. (Doc. 12-3 at 104). The next day, Wade came to his home and told him a "fake story." (Doc. 12-3 at 105). Mears testified that he, Wade, Mahone, and Brooks agreed to tell anyone who asked that some males in a black Crown Victoria picked up McCoy. (Doc. 12-3 at 105–06). A few days later, Mears told a sheriff's deputy the fabricated story. (Doc. 12-3 at 106). He testified that after he spoke with a sheriff's deputy a second time and told the deputy the truth, the deputy arrested him. (Doc. 12-3 at 107–08).

Mears pleaded guilty to accessory after the fact for his participation in the events. (Doc. 12-3 at 88, 117–18). On cross-examination, Mears testified that he, Wade, and the others were all very young and made bad decisions. (Doc. 12-3 at 156–57). He also testified that Wade loved McCoy, both had a good relationship, and Wade was playing with the gun and had pointed the gun at his own head. (Doc. 12-3 at 157, 160).

Brooks also testified at trial. He testified that Wade and McCoy argued in Wade's truck because McCoy had rolled down the front passenger window when the mother of Mahone's child was at the front door. (Doc. 12-3 at 169). The argument continued when they left in Wade's truck. (Doc. 12-3 at 169–70).

Brooks observed Wade pull out a firearm. (Doc. 12-3 at 170). He saw the firearm discharge, and McCoy immediately die when she was struck by a bullet. (Doc. 12-3 at 172). He recognized Wade's firearm because he had held the firearm at the nightclub. (Doc. 12-3 at 171). The firearm was a revolver with a hammer that a person had to pull back before the revolver would discharge. (Doc. 12-3 at 187). Brooks testified that, at the nightclub, the firearm had not been loaded with bullets. (Doc. 12-3 at 172, 180).

According to Brooks, after Mahone asked Wade to go to the hospital, Wade did not do so. (Doc. 12-3 at 173). He testified that instead, Wade drove to an abandoned house, he and Wade moved McCoy's body to a wooded area, and Mears threw McCoy's purse in a trash can. (Doc. 12-3 at 174–75). Brooks also testified that he took the firearm from Wade, observed one spent shell in the cylinder of the revolver, and observed five bullets in a cup in Wade's car. (Doc. 12-3 at 176). He disposed of the firearm and the bullets. (Doc. 12-3 at 177).

Brooks testified that the men fabricated a story that McCoy left in a black car. (Doc. 12-3 at 177–78). He told the fabricated story to a sheriff's deputy and was convicted as an accessory after the fact for his participation in the cover up. (Doc. 12-3 at 178). On cross-examination, Brooks agreed that

6

Wade and McCoy had a "pretty good friendship," spent time together, and never experienced any problems. (Doc. 12-3 at 179). He testified that neither Wade nor McCoy physically fought before the gun discharged, and that a reasonable person would not expect that their argument would lead to a shooting. (Doc. 12-3 at 179). He also testified that later that evening after they disposed of McCoy's body, Wade said he thought that the gun was unloaded, that he accidentally shot McCoy, and that he was shocked and very sorry. (Doc. 12-3 at 179–80, 184–85, 188).

Mahone testified that he and McCoy dated in high school and went to the prom together. (Doc. 12-3 at 199–200). On the night of the shooting, he, Wade, Brooks, Mears, and McCoy drank alcohol and smoked marijuana. (Doc. 12-3 at 201–02, 217–18). Later, after they dropped off the car that belonged to the mother of Mahone's child, Mahone entered Wade's truck and heard Wade and McCoy arguing about the truck's window. (Doc. 12-3 at 204–05). When the truck stopped at a traffic light, he asked McCoy, who was seated in the front passenger seat, to switch seats with him because McCoy started to argue very loudly. (Doc. 12-3 at 205). McCoy did not want to switch seats because the group of friends regularly argued. (Doc. 12-3 at 206). Mahone testified that, a short time later, Wade pulled out a revolver and fired the gun. (Doc. 12-3 at

7

207). According to Mahone, for about five minutes before firing the gun, Wade waved the gun around, played with the gun, pointed the gun at McCoy, and chuckled, "Keep playing and I'm going to shoot the 'F' out of you." (Doc. 12-3 at 207, 228). When Wade started to wave the gun around, Mahone told Wade to "chill out." (Doc. 12-3 at 209).

Mahone testified that, after the gun discharged, he, Wade, Brooks, and Mears started panicking, screaming, and crying. (Doc. 12-3 at 209–10, 219). He told Wade to go to the hospital, and Wade responded that he could not go to jail. (Doc. 12-3 at 210). Wade drove at a dangerous speed to a house where Wade used to live. (Doc. 12-3 at 210). When they arrived at the house, Wade and Brooks dumped McCoy's body in the bushes. (Doc. 12-3 at 212). The next day, he, Wade, Mears, and Brooks met and fabricated a story that, the evening before, McCoy left in a black car. (Doc. 12-3 at 214). Mahone told the fabricated story to a sheriff's deputy. (Doc. 12-3 at 214–15). A few days later, after consulting with a lawyer, he met with a deputy and told the truth. (Doc. 12-3 at 215–16). Like Brooks and Mears, Mahone was convicted as an accessory after the fact for his participation. (Doc. 12-3 at 196).

At trial, on cross-examination, Mahone acknowledged that McCoy touched the gun several times before the gun discharged. (Doc. 12-3 at 222).

8

He also testified that, after the gun discharged, Wade panicked, felt scared, repeatedly said that he did not intend to shoot McCoy, and said that he did not think that the gun was loaded. (Doc. 12-3 at 223–24).

A crime scene detective who inspected Wade's truck after the shooting testified that she did not observe any blood or bullet holes in the truck. (Doc. 12-3 at 237). She stated that the carpet next to the front passenger seat was very wet and the interior of the truck emitted a smell of mold. (Doc. 12-3 at 237). She also testified that, when a detective removed and squeezed the carpet next to the front passenger seat, water with soapy bubbles dripped from the carpet. (Doc. 12-3 at 237). And the detective stated that she observed a white powdery substance underneath the carpet. (Doc. 12-3 at 241).

A detective who was assigned to investigate the murder testified that he interviewed Mahone, Mears, and Brooks individually, and all three told him that, on the night of the shooting, McCoy left in a black Crown Victoria, and no one mentioned Wade. (Doc. 12-3 at 266–67, 271–72). He testified that, during a second interview about eight days later, Mahone and Mears separately recanted their statements about the black Crown Victoria and told the detective about Wade and Wade's truck. (Doc. 12-3 at 268–70). He testified

9

that, after the sheriff's department seized Wade's truck, Wade agreed to speak with the detective. (Doc. 12-3 at 272–73).

After Wade waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966), the detective interrogated Wade about the homicide. (Doc. 12-3 at 274, 283–84). Wade told the detective that he knew McCoy very well and had "called her his sister." (Doc. 12-3 at 288). He said that, the evening of the shooting, he drove McCoy and her friends in his truck to the nightclub. (Doc. 12-3 at 289–91). After spending time at the nightclub, he offered McCoy a ride home but she declined because she wanted to go to a hotel. (Doc. 12-3 at 289, 304). According to Wade, he gave McCoy's friends a ride home and then drove himself home and went to sleep. (Doc. 12-3 at 292–94).

Wade told the detective that he heard that other persons claimed that McCoy died in a shootout, that McCoy was shot in the head in a truck because she would not roll up a window, or that McCoy left in a black car. (Doc. 12-3 at 299, 301). When the detective showed Wade a photograph of McCoy at the prom and a photograph of McCoy's body at the morgue and told Wade that he knew that Wade "did that," Wade denied that he killed McCoy and denied knowing how she died. (Doc. 12-3 at 303–04).

10

Wade told the detective that, after he returned home, Mahone came to his home and asked to borrow his truck. (Doc. 12-3 at 304–05). He claimed that he reluctantly allowed Mahone to borrow the truck and that Mahone returned the truck the next morning. (Doc. 12-3 at 305, 309–11, 317–19, 321). According to Wade, the next day, when he and Mahone were together, McCoy's friend called and asked if McCoy was with them. (Doc. 12-3 at 313, 321–22). He said that Mahone responded that, the night before, McCoy left in a black Crown Victoria. (Doc. 12-3 at 312–13, 322, 324). Wade repeatedly denied killing McCoy. (Doc. 12-3 at 320–21, 326, 327–31, 333–36).

Wade also told the detective that Brooks gave the gun to McCoy and that McCoy placed the gun under the car seat. (Doc. 12-3 at 350, 361). He said that McCoy grabbed the gun, grabbed his hand, and put the gun in his hand up to her head. (Doc. 12-3 at 351). Wade told McCoy to put the gun back under the seat, and McCoy responded, "No, kill me." (Doc. 12-3 at 351, 356, 368–69). He told the detective that a traffic light turned red, he applied the brake to his truck, and the gun discharged. (Doc. 12-3 at 351–52). After the gun discharged, he screamed that they needed to take her to the hospital, but the others told him not to go to the hospital, and he drove to his old home. (Doc. 12-3 at 352). According to Wade, at his old home, while he stayed in the truck, Mears

11

removed McCoy's purse, and Mahone and Brooks removed McCoy's body. (Doc. 12-3 at 360–61). Wade told the detective that when they returned to his home, Mahone went inside to get bleach and cleaning products and Brooks and Mahone cleaned the front passenger seat. (Doc. 12-3 at 365–66).

The detective testified that, when a person points and fires a revolver, the person can observe that a bullet is loaded in the cylinder before pulling the trigger. (Doc. 12-3 at 378–79). During an autopsy, a medical examiner observed a gunshot wound on the left side of McCoy's head, removed a bullet and bullet fragments from McCoy's head, and opined that the gunshot wound was fatal. (Doc. 12-3 at 411–13, 416). A crime analyst identified the bullet removed from McCoy's head as a 0.38-caliber bullet that likely was fired from a 0.38-caliber revolver. (Doc. 12-3 at 386, 395–96).

### III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

### IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to

grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318–19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Wade's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme

13

malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Id. (internal quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 584 U.S. 122, 125 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as

14

persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 125–26.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97–98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

15

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. 12, 18 (2013); accord Brumfield v. Cain, 576 U.S. 305, 322 n.8 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at 18 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016) (internal citations modified). Also, deferential review under § 2254(d) generally is limited to the record that was before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Titlow, 571 U.S. at 19. "Federal courts may grant habeas relief only when a state court

16

blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" <u>Tharpe</u>, 834 F.3d at 1338 (quoting <u>Richter</u>, 562 U.S. at 102–03). This standard is "meant to be" a "difficult" one to meet. <u>Richter</u>, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. <u>See</u> 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).

17

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365–366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to

18

> hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[3] supra, at 747–748, 111 S. Ct. 2546; Sykes,[4] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

---

[3] Coleman v. Thompson, 501 U.S. 722 (1991).
[4] Wainwright v. Sykes, 433 U.S. 72 (1977).

the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal

---

[5] Murray v. Carrier, 477 U.S. 478 (1986).

20

innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of

reasonableness." [Strickland,] 466 U.S. at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id. at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Richter, 562 U.S. at 104 (internal citations modified). The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on

22

the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." Richter, 562 U.S. at 105. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014) (internal citations modified). In other words, "[i]n addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference—this one to a state court's decision—when we are considering whether to grant federal habeas relief from a state court's decision." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004). As such,

23

"[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As Ground One, Wade asserts that the trial judge violated his federal right to due process by denying his motion for judgment of acquittal. (Doc. 7 at 12–20). In support, he argues that the prosecutor failed to prove that Wade had the intent to commit second-degree murder. (Doc. 7 at 15–20). Respondents assert that the claim is procedurally barred because Wade failed to fairly present a federal claim to the state appellate court on direct appeal. (Doc. 12 at 12–16).

Upon review of the record, it appears that while Wade raised a similar insufficiency of evidence claim in his brief on direct appeal, Wade cited only opinions by state appellate courts, failed to cite any federal authority, failed to recite the standard that governs a federal due process claim, and failed to apply the facts of his case to that federal standard. (Doc. 12-4 at 16–20). Consequently, Wade failed to fairly present a federal due process claim. Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1350 (11th Cir. 2004) ("'It is not enough that all the facts necessary to support the federal claim were before the

24

state courts or that a somewhat similar state-law claim was made.' To exhaust the claim sufficiently, Kelley must have presented the state court with this particular legal basis for relief in addition to the facts supporting it.") (quoting Anderson v. Harless, 459 U.S. 4, 6 (1982)).

Despite this, Wade argues that he fairly presented the claim to the state court because the standard governing a sufficiency of the evidence claim under state law is identical to the standard governing a claim under federal law. (Doc. 7 at 13–15). This contention is unavailing.

In Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 456–57 (11th Cir. 2015), the Eleventh Circuit Court of Appeals determined that the petitioner failed to exhaust his federal claim challenging the sufficiency of the evidence supporting his conviction. In doing so, the court determined that the petitioner failed to fairly present a federal sufficiency of the evidence claim because the petitioner invoked a phrase common to both state and federal law, failed to clarify that he intended to assert a federal claim, and did not cite any federal authority in support of the claim. Id. at 459. Here, as in Preston, by Wade's invoking the standard governing a sufficiency of the evidence claim under state law Wade failed to alert the state court to the federal nature of his claim. Preston, 785 F.3d at 460 ("In light of Lucas, simply mentioning a phrase

25

common to both state and federal law, like "sufficiency of the evidence," cannot constitute fairly presenting a federal claim to the state courts.") (citing <u>Lucas v. Sec'y, Dep't of Corr.</u>, 682 F.3d 1342, 1352–53 (11th Cir. 2012)). As such the claim is unexhausted.

Notably, if Wade returned to state court to raise the federal claim, the post-conviction court would dismiss the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c). Consequently, the claim is procedurally defaulted in federal court. <u>Snowden v. Singletary</u>, 135 F.3d 732, 736 (11th Cir. 1998). Because Wade does not assert that either cause and actual prejudice or a miscarriage of justice based on actual innocence excuses the procedural default, the claim is procedurally barred from federal review. <u>Maples v. Thomas</u>, 565 U.S. 266, 280 (2012); <u>House v. Bell</u>, 547 U.S. 518, 536–37 (2006).

Even if the claim were not procedurally defaulted, the claim is meritless. At trial, Wade's counsel made a motion for judgment of acquittal and the trial judge addressed the motion as follows:

> [Trial counsel:] Yes, sir. Judge, at this time, I would make a motion for judgment of acquittal. Specifically, I would address the murder in the second degree as to an imminent act dangerous to another and demonstrating a depraved mind, especially regarding the issue of

26

being done with ill will, hatred, spite, or evil intent.

Judge, I think all the testimony— I think there was no testimony of hatred, ill will, or spite. You had that—from the people that testified, you had that they were all friends. Mr. Wade loved Kalil, and Kalil loved Mr. Wade. You had that there was playing, that this argument was not serious, that from Mr. Mahone that [he] had seen her argue like that a bunch of times with their friends.

The way that the gun was taken out, testimony in front of the jury is it was introduced by another person and that Mr. Wade did not believe that there were bullets in the gun and that he said that he did not mean to do it.

So, [I] ask for a judgment of acquittal based on that.

[Prosecutor #1:]   Your Honor, I think that—a couple of things here.

One, I think it's really a jury issue. What the people thought at the time, whether it was an accident or not is really their opinion. And—

[Trial judge:]   His point is there's no evidence of it. That is a jury question. It's my decision. So, just—you're right. In

27

one sense, it's a jury question, obviously, but his point's there is no evidence of it. So, address that.

[Prosecutor #1:]    Well, I think that the actions of the defendant at this time, the fact that it took some degree of thought to shoot the trigger—or pull the trigger—the trigger was pulled. And you can't divorce what happens after the fact either in terms of showing his ill will.

But there's little case law that we have, where just the act of pointing a firearm at someone can evince hatred, ill will. You don't have to say anything or say, "I hate you," or you know, "I want to kill you." You don't have to say any of that, although even that statement did come out from Mr. Mahone. When he was—recollection was—when his recollection was refreshed, he said, I do recall Mr. Wade saying, "I'm going to f–ing kill you"; "I'm going to f–ing kill you."

So there is some of that there. But just the act of pointing a gun at somebody can be depraved in and of itself. And the fact that they are friends, I mean, we—there are murders all the time where people are friends or husband and wife, and there may be some love amongst them at some point. But it doesn't mean you can't snap and just

28

<table>
<tr><td></td><td>develop that ill will, hatred, and spite.</td></tr>
<tr><td>[Trial judge:]</td><td>I agree with that.</td></tr>
<tr><td>[Prosecutor #1:]</td><td>So, I think that evidence is there, and I think at this point, it's a jury question. And I think Mr. Atkinson has a case.</td></tr>
<tr><td>[Prosecutor #2:]</td><td>Your Honor, the State would be relying upon two cases primarily. I can give you the case cites for those.</td></tr>
<tr><td>[Trial judge:]</td><td>Please.</td></tr>
<tr><td>[Prosecutor #2:]</td><td>The case cites are 495 Southern Second 197, which is [the] case of <u>Dellinger versus State</u>, a 1986 supreme court case. And in the case of <u>Dellinger</u>, the issue was—in that particular case, the defendant was charged with second-degree murder in which admittedly, him and his wife are arguing, but the defense was that the defendant did not know the handgun—or the rifle in that case, was loaded. And the court ultimately found that even the defendant's actions of knowing or not knowing that the rifle was loaded, by the very action of pointing that gun and pulling the trigger, that evinced [depravity] of mind, evidence in second-degree murder.</td></tr>
</table>

29

And then [the] State would also be relying upon <u>Hines versus State</u>. <u>Hines versus State</u> is a case cited at 227 Southern Second 334. It's a 1969 supreme court case. It's also a case of second-degree murder. The ultimate issue in this case was that the victim and the defendant were joking around. The defendant told the victim to go out and play like she was a squirrel in the yard, so that he could shoot her, and it would appear to be an accident. The ultimate issue, everybody agreed that he was joking at the time. But he pulled a loaded shotgun. He pulled the trigger, and he killed the victim. And the court found that the very action of pointing the trigger—pointing a loaded gun, even in the action of joking, evinces depravity of mind, such as in second-degree murder.

And in both cases, second-degree murder was upheld.

[Prosecutor #1:]    And the other thing, Your Honor, looking at the light most favorable to the State, I wouldn't concede—or the State's not conceding that Mr. Wade believed that there [were] no bullets in that firearm. I think there was some testimony from Detective Gupton about [Mr. Wade] potentially could have seen the round, and also Mr. Brooks—

30

[Trial judge:]    His testimony was he couldn't have seen the round.

[Prosecutor #1:]    He said you might—well—

[Prosecutor #2:]    Only at the point that the hammer was drawn.

[Prosecutor #1:]    Right. And there was no—it was unclear whether—and even Mr. Wade's own statement to the detective about whether the hammer was drawn, he couldn't remember.

But also, the testimony from Mr. Brooks is, "When I gave that gun to Mr. Wade, it was unloaded."

[Trial judge:]    It was unloaded? Is that what he said?

[Prosecutor #1:]    I believe he said it was unloaded.

[Prosecutor #2:]    Yes, sir. Mr. Brooks testified that when he was in the club, and he was in possession of the handgun, the gun was not loaded at that point.

[Prosecutor #1:]    That's what he said.

[Trial judge:]    Was not loaded.

[Prosecutor #1:]    Correct, said it was unloaded. And he gave it to Mr. Wade, which would suggest that somebody had to load that firearm.

31

> [Trial judge:] All right. The standard is in the light most favorable to the State. I think there was an argument in the truck between the defendant and Ms. Kalil. The extent of that argument, how serious was the argument, is something the jury can consider, but I certainly think that there's enough to overcome that standard in the light most favorable to the State, [ ] a prima facie case of guilt as to that charge.
>
> So, I'm going to allow the case to go to the jury, let them make that decision. What they are supposed to do is the legally correct answer in this case. So, I'll deny the defendant's motion for judgment of acquittal.

(Doc. 12-3 at 419–25).

"It is axiomatic that a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm." Jackson v. Virginia, 443 U.S. 307, 314 (1979). But, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original). "[This] standard must be applied with explicit

32

reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16.

Under Florida law, "[a] second-degree murder is defined as the unlawful killing of an individual when perpetrated by 'any act imminently dangerous to another and evincing a depraved mind regardless of human life, <u>although without any premeditated design</u> to effect the death of any particular individual.'" <u>Porter v. State</u>, 384 So. 3d 839, 841 (Fla. 1st DCA 2024) (quoting § 782.04(2), Fla. Stat.) (emphasis in original). In <u>State v. Montgomery</u>, 39 So. 3d 252 (Fla. 2010), the Florida Supreme Court explained:

> Conduct that is "imminently dangerous to another and evincing a depraved mind" is characterized by "an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life."

<u>Id.</u> at 255–56. Further, the term "'[d]epraved mind within the second-degree murder statute has been variously defined as importing malice in the sense of ill will, hatred, or evil intent, and as an inherent deficiency of moral sense and rectitude.'" <u>Porter</u>, 384 So. 3d at 841 (quoting <u>Hines v. State</u>, 227 So. 2d 334, 335–36 (Fla. 1st DCA 1969)). And the term "'malice is not limited in its meaning to hatred, ill will and malevolence, but denotes a wicked and corrupt

33

disregard of the lives and safety of others . . . a failure to appreciate social duty.'" Porter, 384 So. 3d at 841 (quoting Hines, 227 So. 2d at 335–36).

Florida courts have explained, that "'[a]lthough exceptions exist, the crime of second-degree murder is normally committed by a person who knows the victim and has had time to develop a level of enmity toward the victim.'" Holmes v. State, 278 So. 3d 301, 304 (Fla. 1st DCA 2019) (citation omitted). Also, the requisite intent can be "inferred from the circumstances and may be demonstrated by the defendant's conduct before and after his use of deadly force." Finch v. State, 299 So. 3d 579, 580 (Fla. 1st DCA 2020). And, "'[b]ecause direct evidence of intent is rare, and intent is usually proven through inference, a trial court should rarely, if ever, grant a motion for judgment of acquittal on the issue of intent.'" Dennis v. State, 338 So. 3d 279, 282 (Fla. 4th DCA 2022) (citation omitted).

Here, Mears testified that Wade and McCoy began arguing after McCoy rolled down the front passenger window of Wade's truck in front of the home where the mother of Mahone's child lived. (Doc. 12-3 at 95–96). Brooks testified that Wade became upset because the mother of Mahone's child was at the front door when McCoy rolled down the window. (Doc. 12-3 at 169). Mahone testified that he offered to switch seats with McCoy when the argument escalated and

34

when McCoy began to argue very loudly. (Doc. 12-3 at 205). Mears, Brooks, and Mahone saw Wade pull out the gun and fire the gun, when Wade's truck was stopped at a traffic light. (Doc. 12-3 at 98–99, 170–72, 207). Mahone testified that, he saw Wade point the gun at McCoy and that before Wade fired the gun, Wade chuckled and told McCoy, "Keep playing and I'm going to shoot the 'F' out of you." (Doc. 12-3 at 207, 228). Mears saw Wade point the gun at McCoy and denied observing McCoy reach for the gun. (Doc. 12-3 at 97–98). And Brooks denied that Wade and McCoy physically fought before the gun discharged. (Doc. 12-3 at 179).

Viewed in the light most favorable to the prosecution, this evidence was sufficient to permit a jury to conclude that Wade had the requisite intent to commit second-degree murder. Holmes, 278 So. 3d at 304–05 ("Holmes admitted that he pulled out a loaded pistol and pointed it at the victim's head. That act alone is competent evidence that Holmes possessed the requisite intent to commit second-degree murder."); Porter, 384 So. 3d at 842 ("[The defendant] conceded to law enforcement officers that he shot the decedent because the decedent 'got under [his] skin.' And, by shooting twice at close range, Appellant certainly demonstrated disregard for human life."). See also Jacobson v. State, 248 So. 3d 286, 288 (Fla. 1st DCA 2018) ("Jacobson pulled

35

out a loaded shotgun with the hammer cocked, and Edwards was shot in the head at close to point-blank range. Viewed in the light most favorable to the State, the evidence amply demonstrated an act imminently dangerous to another."). Moreover, Wade's conduct after the shooting supported a conclusion that he acted with ill will. After the gunshot killed McCoy, Mahone told Wade to go to the hospital, and Wade responded that he could not go to jail. (Doc. 12-3 at 210). Wade instead drove at a dangerous speed to a house where he used to live, Wade and Brooks dumped McCoy's body in bushes near the house, and Mears placed McCoy's purse next to a tree. (Doc. 12-3 at 102, 174–75, 212). Brooks disposed of the gun and the bullets. (Doc. 12-3 at 177). Wade, Brooks, Mears, and Mahone agreed to tell a fake story that Wade told Mears if anyone asked about McCoy. (Doc. 12-3 at 105–06). Mears, Brooks, and Mahone each told a sheriff's deputy the fabricated story before recanting and admitting Wade's involvement. (Doc. 12-3 at 106, 178, 214–15). A crime scene investigator who inspected Wade's truck after the shooting testified that the carpet next to the front passenger seat was very wet and that water with soapy bubbles dripped from the carpet when squeezed. (Doc. 12-3 at 237). Viewed in the light most favorable to the prosecution, this evidence supported a finding that Wade acted with ill will and evil intent. Holmes, 278 So. 3d at 305 ("After

36

the victim was shot, Holmes did not stop driving the car. He did not try to render aid. He did not call 911. And he did not drive to a hospital. Instead, Holmes disposed of the gun, called his roommate, and provided false reports about the shooting. These actions support a finding that Holmes possessed ill will, hatred, spite, or evil intent towards the victim and that the shooting was no accident.").

Certainly, some of the testimony by Mears, Brooks, and Mahone supported Wade's defense that an accident caused McCoy's death. However, as the trial judge instructed, "it [was] up to [the jurors] to decide what evidence [was] reliable," and "[the jurors] may find some of the evidence not reliable or less reliable than other evidence." (Doc. 12-3 at 588). Indeed, "a jury is the judge of the credibility of the witnesses and the evidence, and a jury is free to believe parts of a witness's testimony and disbelieve other parts." Myron v. S. Broward Hosp. Dist., 703 So. 2d 527, 531 (Fla. 4th DCA 1997). And it appears that the jury was not persuaded by the potentially exculpatory evidence. Because the evidence presented was sufficient for a jury to find all of the elements of the offense of the charge of murder in the second degree, Wade's federal due process claim in Ground One is due to be **DENIED**.

37

## B. Ground Two

Wade asserts that the trial judge violated his federal right to due process by overruling objections to comments by the prosecutor during closing. (Doc. 7 at 20–28). Respondent once again argues that the claim is procedurally defaulted because Wade failed to fairly present a federal claim to the state court. (Doc. 12 at 23–25).

In his brief on direct appeal, Wade raised a similar claim but cited only opinions by state appellate courts, failed to recite the standard that governs a federal due process claim, and failed to apply the facts of his case to that federal standard. (Doc. 12-4 at 16–20). In the title of the claim in his brief, Wade asserted that the trial judge denied him a fair trial and cited the Fourteenth Amendment to the U.S. Constitution. (Doc. 12-4 at 25). However, he presented no argument applying the Fourteenth Amendment, and this fleeting reference to federal law by itself is insufficient to fairly present a federal claim. McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) ("We therefore hold that '[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'") (quoting Kelley, 377 F.3d at 1345).

38

Notably, if Wade were to return to state court to attempt to fairly present the federal claim, the post-conviction court would dismiss the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c). Consequently, the claim is procedurally defaulted in federal court. Snowden, 135 F.3d at 736. Because Wade does not assert that either cause and actual prejudice or a miscarriage of justice based on actual innocence excuses the procedural default, the claim is procedurally barred from federal review. Maples, 565 U.S. at 280; House, 547 U.S. at 536–37.

Even if the claim were not procedurally defaulted, the claim is meritless. On federal habeas review, "[an] inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court, and the Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process." Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1287 (11th Cir. 2012) (citing Williams, 529 U.S. at 412). And "[t]he Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, [a federal court] cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law." Reese, 675 F.3d at 1288 (citations omitted). See also 28 U.S.C.

39

§ 2254(d)(1). For that reason alone, Wade's federal due process claim is without merit.

Notwithstanding § 2254(d)(1), "[p]rosecutorial misconduct can be a basis for relief if it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Land v. Allen, 573 F.3d 1211, 1219 (11th Cir. 2009) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). "To determine whether a prosecutor's statements [ ] are 'sufficiently egregious to result in the denial of due process,' [a court] consider[s] the comments in the context of the entire trial and examine[s] '(1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; [and] (3) the trial court's instructions [ ]." Reese, 675 F.3d at 1291 (citation omitted).

**Misstatement of Law**

Wade contends that the trial judge violated his federal right to due process by overruling an objection to the following comment by the prosecutor that allegedly misstated the law. (Doc. 7 at 21–23). The record reflects the following with respect to this claim:

> [Prosecutor:]    So, that brings me—first, I want to talk about excusable homicide. Excusable homicide, you're going to see an instruction. When the killing

40

is committed by accident and misfortune, doing a lawful act or [using] lawful means.

Pulling a handgun in a car and pointing [it] at a nineteen-year-old girl is not lawful. There is no lawful means to do that.

Killing by accident and misfortune in the heat of passion, sudden provocation.

Important thing here is provocation. What did she do that made him do it? If she'd broken into his house and he had pulled a gun and accidentally killed her, that's sudden provocation. If she had attacked him in any way, that's provocation. There is no provocation in this case. So, that is not excusable. It is not justified.

When the killing is submitted by accident resulting from sudden combat. Same thing. There was no combat in this case. She did not attack him. There is nothing that he did that is excusable or justified.

So, that brings me to an accident. Saying that something was an accident only defeats first-degree murder because you see, you have intentional action, purposeful action, things you do because you

41

intend to do them, and then you have things that are [an] accident.

[Trial counsel:]    I am going to object to that statement. I believe it's a misstatement of the law.

[Trial judge:]    Well, it's overruled.

[Prosecutor:]    So, saying that it was an accident just means he didn't intend to do it. That's first-degree murder. We're not charging him with first-degree murder. [The] State did not ask you to find him guilty of first-degree murder, and you could not, under the law, with this set of facts, find him guilty of first-degree murder.

But you actually can find him guilty of second-degree murder, and you should, and here's the reason. Defense counsel's going to get up here, and he's going to say it was [an] accident. The thing is when it comes to the action of pulling the trigger and everything that led up to that point, those were not accidents. It was not an accident that this defendant brought a gun into that car. It was not an accident when a bullet, a bullet, was put into the cylinder, the chamber of that gun. It was not an accident when, during the course of an argument, this defendant drew that handgun from under the seat. It was not an accident. During the course of a five-

42

> minute drive, he continuously waved it at her head, while saying and chuckling, "I'm going to f–ing kill you. I'm going to f–ing kill you." Think it's funny, with a loaded handgun.
>
> It's not an accident that he did all of this in a car less than the size of this jury box. It's not an accident that he did this while driving a vehicle down the road. Those were not accidents. And those are the facts that make this case a second-degree murder because he led up and put them in a position in which she would die.

(Doc. 12-3 at 458–61).

Under Florida law, "[h]omicide is excusable when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution, and without any unlawful intent." § 782.03, Fla. Stat. Also, "[h]omicide is excusable when committed . . . by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner." § 782.03, Fla. Stat. The defense of excusable homicide applies to second-degree murder. Reyes v. State, 924 So. 2d 932, 933 (Fla. 3d DCA 2006). Taken in context, the prosecutor's comments did not misstate the law. The prosecutor explained why the homicide was not excusable because of

43

an accident. The prosecutor argued that the evidence at trial did not demonstrate either a lawful act by Wade or provocation or sudden combat by McCoy. Consequently, the prosecutor did not impermissibly comment on excusable homicide.

Also, before closing argument, the trial judge instructed the jury that a statement by an attorney is not an instruction on the law and advised that the jury would receive instructions on the law after closing argument. (Doc. 12-3 at 454–55). After closing argument, the trial judge twice instructed that the jury must follow the law defined in the instructions. (Doc. 12-3 at 592, 599). The trial judge correctly defined excusable homicide and instructed that excusable homicide applied to second-degree murder. (Doc. 12-3 at 579–80). Notably, "jurors are presumed to follow the court's instructions." Brown v. Jones, 255 F.3d 1273, 1280 (11th Cir. 2001).[6]

Here, because the prosecutor did not misstate the law governing excusable homicide, and the court properly instructed the jury, any

---

[6] Wade further asserts that the trial judge violated his federal right to due process by permitting the prosecutor to argue that evidence of using a firearm to kill a person demonstrates ill will, hatred, spite, and evil intent. (Doc. 7 at 22–23). In Ground Four, Wade asserts that trial counsel deficiently performed by not moving for a mistrial after the trial judge sustained objections to these comments. (Doc. 7 at 38–39). For the reasons explained below in the ruling on Ground Four, the comments did not misstate law, and any misstatement of law did not substantially and injuriously affect the jury's verdict.

44

misstatement of law by the prosecutor did not substantially and injuriously affect the jury's verdict. Raheem v. GDCP Warden, 995 F.3d 895, 937 (11th Cir. 2021) (citing Brecht v. Abrahamson, 507 U.S. 619 (1993)). As such, Wade's federal due process claim based on the above comment is meritless.

**Misstatement of Fact**

Wade asserts that the trial judge violated his federal right to due process by overruling objections to certain comments by the prosecutor that allegedly misstated facts. (Doc. 7 at 23–24). The record reflects the following with respect to this claim:

**Comment One**

> [Prosecutor:]   Day two, does he go to sleep and wake up and say, "This is an accident?" No. What he does on day two is his friends come over. And they concoct this lie, this story. And the story, the lie, is important because what he does is he sends his friends, his co-defendants, out into the world, and he says to them—the story they came up with is the three of you were there. I wasn't. Essentially, what he's saying is you three go out, tell your friends, your family, the police, everyone you can think of, tell them there's no reason to come talk to me, Freddie Wade, Freddie Wade, who pulled the trigger on accident. I don't want

45

> anybody coming to talk to me. I don't want to admit what I did. Tell them I wasn't there. So, they do. His friends go out in the world.

[Trial counsel:]    I want to object to facts not in evidence. There are absolutely no facts.

[Trial judge:]    Sustained.

[Prosecutor:]    So, they go out and they tell the story.

(Doc. 12-3 at 468–69).

During the trial, Mears testified that, the day after the shooting, Wade came to his home and told him a "fake story" that "everybody had to say." (Doc. 12-3 at 104–06). Specifically, he testified:

[Prosecutor:]    All right. And let's talk about [the] very next day. Do you see the defendant again the next day?

[Mears:]    Yes, sir.

[Prosecutor:]    Okay. What were the circumstances of when you see Mr. Wade? I said the next day. I mean, later on that afternoon. So, the twenty-first, where did you see him?

[Mears:]    At my house.

[Prosecutor:]    Okay. And when you see him, did he tell you anything?

46

[Mears:] Fake story.

[Prosecutor:] Well, you're going to have to help me out with that. What do you mean by fake story?

[Mears:] It was, like, a fake story that we had to say that, everybody had to say, I guess.

[Prosecutor:] Okay. Who's everybody who had to say a fake story? Who's everybody?

[Mears:] Me, Flip, and Boogie, and Freddie.

[Prosecutor:] So, four of you all come up with some story.

[Mears:] Yes, sir.

[Prosecutor:] Okay. And whose idea is it to come up with a story?

[Mears:] I'm not sure whose idea it was. I can't remember all that. I don't know, like.

[Prosecutor:] Well, what is the fake story that you guys come up with?

[Mears:] She got picked up by a black— a black Crown Vic, I think.

[Prosecutor:] And was there any part of the story about where Freddie was at this time?

47

|            |     |
|------------|-----|
| [Mears:] | Where Freddie was? |
| [Prosecutor:] | If you were going to be asked by the police or law enforcement where Freddie was that night, what were you supposed to say as far as the story? |
| [Mears:] | Oh, I don't know. I don't remember. I don't remember what I was supposed to say, where he was at or what. [Because] the fake story that we all told was just that Kalil got picked up by a black Crown Vic with some dudes in it. |

Id. Mears, Brooks, and Mahone testified that they told a sheriff's deputy the fabricated story. (Doc. 12-3 at 106, 178, 214–15). And the detective testified that Mears, Brooks, and Mahone told him the fabricated story and did not mention Wade. (Doc. 12-3 at 266–67, 271–72).

Also, during the recording of the interview played for the jury, Wade told a detective that he heard a rumor that, on the night of the shooting, McCoy left in a black Crown Victoria (Doc. 12-3 at 299–301):

|            |     |
|------------|-----|
| [Detective:] | Did you hear anything about what's going on with Kalil or what the word on the street is? |
| [Wade:] | It's — it's a lot of stories going on. They're saying she got — they got in a shootout and she got shot. And then they were saying something |

48

|  | about she wouldn't roll up the window, and she got shot in the head. Like, just a lot of stories going on. |
|---|---|
| [Detective:] | She wouldn't roll up the window and got shot in the head? |
| [Wade:] | Yeah. They said something about she wouldn't roll up the car window, and she got shot in the head. Somebody shot her in the truck, and she got shot in the head. |
|  | . . . |
| [Detective:] | Heard anything else? I mean, [because] what I've been hearing was that she may have gotten in some other car or something, and that's the last people that had seen her. |
| [Wade:] | Yeah. They [were] like, she done got in a black car. |
| [Detective:] | Oh, okay. |
| [Wade:] | But people started saying she was in the truck, but that's the last thing I heard was she got in a black car. |

Id. The prosecutor reasonably inferred from Mears's testimony that, the day after the shooting, Wade told his friends the "fake story" about the Crown Victoria and told his friends to tell the "fake story" which did not involve Wade

49

to anyone who asked about McCoy. Also, the prosecutor reasonably inferred from the testimony by Mears and the other witnesses and from the statements by Wade during the interview that the four friends told a sheriff's deputy and other persons the "fake story" about the Crown Victoria. Consequently, the prosecutor did not misconstrue the evidence. Johnson v. State, 238 So. 3d 726, 739 (Fla. 2018) ("Prosecutors have wide latitude in closing argument 'to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.'") (citation omitted).

**Comment Two**

| [Prosecutor:] | Day nine, they find his truck. Now, he knows the lie is over. The lie that he told them is up because why is his truck involved? So, he called Boogie about five o'clock, and he says—he wants to ask him, "Hey, man, what's going on? What's up, Boogie? Why are they taking the truck?" |
|---|---|
| [Trial counsel:] | Judge, there are no facts to this. Nobody has— |
| [Prosecutor:] | Right. It's inference from the facts. |
| [Trial judge:] | Sustained. |
| [Trial counsel:] | This is made up. This is wrong, Judge. |

50

[Trial judge:]      I sustained the objection.

[Trial counsel:]      Judge, can I have a curative instruction to disregard?

[Prosecutor:]      Your Honor, Mr. Wade testified in his interview that he called—

[Trial judge:]      Come to [a] sidebar.

[Prosecutor:]      Yes, sir.

(The following sidebar conference was had out of the hearing of the jury.)

[Trial judge:]      All right. The objection was to facts not in evidence.

[Prosecutor #1:]      Yes, sir. The facts that are in evidence that are included in the interview is that he is aware of the fact that his truck is taken. He tries to call Boogie at five o'clock on the day that he goes down for the interview. There's a logical inference from the fact that he comes to talk on that day and he calls Boogie before he comes in that he's trying to figure out what is happening.

[Prosecutor #2:]      He said—he sent him a text message too.

[Prosecutor #1:]      He's trying to contact him before he ultimately comes in and give an admission. That is a logical inference from the facts.

51

[Trial counsel:]    Judge, he's sitting there, saying things that the defendant said—

[Trial judge:]    Yeah. That's the problem.

[Trial counsel:]    —this is wrong.

[Trial judge:]    That's the problem I have. You're probably right. There's a logical inference from some things, but you're putting words in his mouth [ ] that weren't said.

[Prosecutor #1:]    Well, I said—I said that was the purpose of him making the call was to say that. I never said that he said that. It's [ ] clear from the evidence that he never connected the call.

[Trial judge:]    My understanding of your argument, my recollection, was you were putting words from the defendant's mouth about what he told [Boogie] that there was no testimony about.

[Prosecutor #1:]    Yes, sir. I can correct that and say that the call was not completed, but that was the intent of his message. Because I think that's a logical inference.

[Trial judge:]    I think that is a logical inference. But then what I'm concerned about is putting words because then you've got—you know, here's my concern. We had a full day of

52

testimony. They're going by their memory. Is this what he really said? They may think this is what he really said because you've said, this is what he said, when, in fact, we don't know what he said.

[Prosecutor #1:]   Yes, sir.

[Trial judge:]   So, if you make the argument, the inference, that this is what the purpose of the call was. I think that's legitimate, Mr. Andux, and I would overrule the objection if that's the extent of his argument.

[Prosecutor #1:]   Yes, sir.

[Trial judge:]   But I would stay away from—

[Prosecutor #1:]   Yes, sir.

[Trial judge:]   —what would seem to be creating facts. Now, I was thinking—I don't know if I remember anybody actually saying that. That was the concern, I think, Mr. Andux had.

[Prosecutor #1:]   It's included in the interview. I've watched the interview twenty-five times.

[Trial judge:]   No, no, no. It's specific words—

[Prosecutor #1:]   Yes, sir.

[Trial judge:]   —that the defendant was saying—

53

[Prosecutor #1:]    Yes, sir.

[Trial judge:]    —or not in the—

[Prosecutor #1:]    I think specifically in the interview, he does say, I was calling him to say, "What's up, Boogie?"

[Trial judge:]    Okay. Well, that may be.

[Prosecutor #1:]    We can—do you want the transcript from the interview?

[Trial judge:]    Going forward—because we're getting a lot of objections. Object if you think it's a reasonable objection. That's how I understand the law in closing argument. So, tailor your argument accordingly.

[Prosecutor #1:]    Yes, sir.

(Doc. 12-3 at 470–74).

Before closing arguments, a detective testified that, as of June 30, 2011, when sheriff's deputies took possession of Wade's truck, he had not yet spoken with Wade. (Doc. 12-3 at 270–72). He testified that, after the deputies took possession of Wade's truck, Wade's family member called the sheriff's office and wanted to bring Wade to the sheriff's office for an interview. (Doc. 12-3 at 271–72). Later that evening, on June 30, 2011, Wade came to the sheriff's office for an interview. (Doc. 12-3 at 273). After being advised of his Miranda rights,

Wade told the detective that he had texted Mahone, also known as Boogie, earlier that day (Doc. 12-3 at 298–99):

| [Detective:] | And the other one, Sunday, that was last Sunday? |
|---|---|
| [Wade:] | Yes, sir. I text—I text[ed] Boogie earlier, but he didn't text back. |
| [Detective:] | Texted him earlier when? |
| [Wade:] | Huh? |
| [Detective:] | Texted him earlier when? |
| [Wade:] | When, like—it was like, five o'clock, [or] something, today. |
| [Detective:] | Okay. What was that about? |
| [Wade:] | [Because] I [hadn't] heard from him. I was just like, dang, bro, what's up? And he didn't get back. |

Id. Also, during the recorded interview, Wade admitted that he came to the sheriff's office for an interview because the sheriff's deputies had seized his truck (Doc. 12-3 at 302):

| [Detective:] | No, no, no. Don't play that. I don't get to play that. I don't—I don't tell you what happened, but I know what happened inside the Tahoe. Do you know where your Tahoe is right now? |
|---|---|

55

| [Wade:] | Yes. The police have it. |
| [Detective:] | Exactly. So, that's why you came in and said something. |
| [Wade:] | Yes, sir. |

Id.

From this evidence, the prosecutor reasonably argued that, nine days after the shooting, when Wade's truck was seized, Wade knew that the "lie" about McCoy leaving in the black Crown Victoria was "over." (Doc. 12-3 at 470). He further argued the reasonable inference that, after Wade's truck was seized, Wade texted Mahone, "Hey man, what's going on" and "What's up, Boogie," because he wanted to learn why the sheriff's deputies seized his truck. (Doc. 12-3 at 470). Consequently, the prosecutor did not misconstrue the evidence. Johnson, 238 So. 3d at 739.

Even if the prosecutor misconstrued the evidence by stating that Wade further asked Mahone, "Why are they taking my truck," the misstatement of fact did not substantially and injuriously affect the verdict. A jury could reasonably infer from the evidence that Wade texted Mahone for that reason. Randolph v. McNeil, 590 F.3d 1273, 1277 (11th Cir. 2009).

**Comment Three**

[Prosecutor:]      All of the testimony from the witnesses counteracts what Frederick Wade says, and that's because Frederick Wade only [cares] about Frederick Wade. Everything that Frederick Wade had done up to that point was to defend and protect Frederick Wade. That's why he dumped the body. That's why he got rid of the gun. That's why he cleared the car. And that's why he said over and over again that everybody else did something. He did nothing.

     At no point in that video does he admit to anything whatsoever. They put the gun in his hand. They drew the gun. His finger wasn't on the trigger. He does not admit[ ] to anything. And that is why I call this —

[Trial counsel:]      Judge, again, as to — those are — that's a fact not in evidence. It's improper.

[Prosecutor:]      It is in evidence.

[Trial judge:]      I'll overrule the objection.

[Prosecutor:]      That's why I call it an admission and not a confession because they finally get him to admit that he was even in the car, after [ ] all that interview and after all those questions, and at

57

that point, he will not confess to what he did.

(Doc. 12-3 at 500–01).

During the interview, Wade told the detective that McCoy grabbed the gun from under the car seat, grabbed his hand, placed his hand on the gun, placed the gun against her head, and told him, "Come on. You're going to just kill me." (Doc. 12-3 at 351). He claimed that he had told McCoy to put the gun back under the seat and told her, "No, Kalil," when she put the gun up against her head. (Doc. 12-3 at 356, 369). He further told the detective, that when a traffic light turned red and he braked, the gun discharged. (Doc. 12-3 at 351–52). Also, Wade told the detective that he wanted to go to the hospital, but the others told him not to go to the hospital. (Doc. 12-3 at 352). He said that, at his old home, Mahone and Brooks removed McCoy's body, Mears removed McCoy's purse, and he remained in his truck. (Doc. 12-3 at 360–61). And he told the detective that, when they returned to his home, Mahone went inside to get bleach and cleaning products, and Brooks and Mahone cleaned the front passenger seat. (Doc. 12-3 at 365–66).

The prosecutor reasonably argued based upon Wade's statements during the interview that Wade refused to "admit to anything whatsoever." (Doc.

58

12-3 at 500). Consequently, the prosecutor did not misconstrue the evidence.

Johnson, 238 So. 3d at 739.

### Comment Four

[Prosecutor:] One of the things—and I don't know if defense counsel's going to argue this, but I think it may come out. There was a lot of questions to Detective Gupton and to the FDLE analyst about single-action versus a double-action revolver and what constitutes single action versus double action. Essentially, what they [say] is that a single-action revolver requires you to draw the hammer back before it can fire. A double-action revolver, you don't have to do that. When you pull the trigger back, it will both pull the hammer back and fire the gun.

And the reason that's important is because of the pounds of pressure. And, again, we don't know what the pounds of pressure are on the particular handgun that was used because this defendant told Jonathan Brooks to get rid of it.

[Trial counsel:] Judge, there is absolutely no statement on the record that he told him that. This is improper.

[Prosecutor:] Your Honor, there was a specific question asked by Mr. Andux to Mr. Brooks. Did you —

59

[Trial judge:]    Ladies and gentleman of the jury, you are to rely on your own recollection of the what the evidence is and apply it to the law as instructed. So, I'll overrule the objection.

(Doc. 12-3 at 502–03).

On direct examination, Brooks testified that, after the shooting, he "took possession of" the gun and "got rid" of the gun and the bullets. (Doc. 12-3 at 176–77). On cross-examination, Brooks testified that, after the shooting, Wade gave Brooks both the gun and a cup that contained the bullets. (Doc. 12-3 at 180). Because the prosecutor reasonably inferred from this testimony that Wade gave to Brooks the gun and the bullets to "get rid of [them]" (Doc. 12-3 at 502–03), the prosecutor did not misconstrue the evidence. Johnson, 238 So. 3d at 739.

Even if the prosecutor misconstrued the testimony, the trial judge instructed the jury immediately after the comment that each juror should rely on his or her own recollection of the evidence and apply the law to that evidence. (Doc. 12-3 at 503). Before closing argument, the trial judge also instructed that a statement by an attorney is not evidence. (Doc. 12-3 at 454). And after closing argument, the trial judge instructed the jurors that they must

60

base a verdict on the testimony by witnesses and exhibits admitted into evidence. (Doc. 12-3 at 592). A federal court presumes that jurors follow the court's instructions. On this record, Wade has failed to demonstrate that the brief and isolated comment by the prosecutor substantially and injuriously affected the jury's verdict. Brown, 255 F.3d at 1280; Randolph, 590 F.3d at 1277.

**Comment Five**

[Prosecutor:] Now, I'm not up here and we're not suggesting to you that on that day—this kind of goes back to [the] video and some things that were said. Nobody is suggesting to you that when Mr. Wade woke up that day, he said, "You know what, I'm so angry at Kalil, I'm going to shoot her later today." Didn't happen that way. Didn't happen that way.

But something got him angry. Something did for him to go to that—get to that point, for him to point a firearm at her and pull the trigger. And that trigger had to be pulled. There was conscious decision on his part to pull that trigger. It didn't go off. He had to do something. He had to make that decision. And I would submit to you, they were arguing and they were playing around. Remember, the only

61

| | |
|---|---|
| | one laughing about this is Mr. Wade. |
| [Trial counsel:] | Judge, that's the second time. I would object to those facts not in evidence. |
| [Prosecutor:] | Your Honor, they can rely on their own memories. He keeps doing that. |
| [Trial judge:] | Overruled. They can rely on their memory of the evidence and the video. They'll watch the video. |
| [Prosecutor:] | He's the only one that's doing that. |

(Doc. 12-3 at 560–61).

At trial, Mahone testified that, after pulling out the gun, Wade played with the gun and pointed the gun at McCoy. (Doc. 12-3 at 207). He also testified that, while playing with the gun and before the gun discharged, Wade chuckled and said, "Keep playing and I'm going to shoot the 'F' out of you." (Doc. 12-3 at 228). The prosecutor reasonably argued from this testimony that, before the gun discharged, Wade played with the gun and was the only person laughing. Consequently, the prosecutor did not misconstrue the evidence. Johnson, 238 So. 3d at 739.

62

**Comment Six**

Next Wade asserts that the trial judge violated his federal right to due process by permitting the prosecutor to make the following comment which drew no objection.

> [Prosecutor:]   [During] part of the video, Mr. Wade is crying. And the question that I would have for you is why is Mr. Wade crying? I would imagine defense counsel's going to get up, and he's going to say that Mr. Wade is crying because it's finally out, and he finally has the ability to grieve for his friend.
>
> He didn't grieve days one through nine, when he had the ability to make right what happened. He didn't grieve when they showed him the picture of Kalil at the beginning of the interview, and he said, "I ain't do that"; "I ain't do that." He wasn't grieving when he was blaming Boogie for driving the car, and it must have been Boogie that killed Kalil, according to him. He wasn't grieving then.
>
> It wasn't until he finally had to admit what he did, and he came to the realization that he was in trouble. And that's when he cried because, again, Frederick Wade cares about Frederick Wade and he was crying for himself.

63

(Doc. 12-3 at 501–02).

The evidence at trial demonstrated that, after McCoy suffered a gunshot wound in Wade's car, Wade did not drive to a hospital and instead dumped her body in bushes by a house where he used to live. (Doc. 12-3 at 102). When Mahone asked Wade to go to a hospital, Wade responded that he could not go to jail. (Doc. 12-3 at 210). The next day, Wade and the other males fabricated a story about McCoy's disappearance and scrubbed Wade's truck of evidence of the murder. (Doc. 12-3 at 214, 365–66). Nine days later, Wade's family member called the sheriff's office and wanted to bring Wade to the sheriff's office for an interview about the murder. (Doc. 12-3 at 272).

The detective who was investigating the murder had not spoken to Wade before the interview. (Doc. 12-3 at 271). When he did speak to him, the detective showed Wade a picture of McCoy's body at the morgue and told him that he knew that Wade "did that." (Doc. 12-3 at 303–04). In response, Wade denied that he killed her and denied knowing how she died. (Doc. 12-3 at 303–04). During the interview, Wade first said that he gave McCoy's friends a ride home and then drove himself home and went to sleep. (Doc. 12-3 at 292–94). He also said that Mahone came to his home later that night and borrowed his truck. (Doc. 12-3 at 304–05, 309–11, 317–19, 321). Later

64

Wade told the detective that McCoy grabbed the gun, placed his hand on the gun, and placed the gun against her head, and the gun discharged. (Doc. 12-3 at 351). From this evidence, the prosecutor fairly drew the inference and argued that Wade cried when he finally admitted that he shot and killed McCoy because he felt sorry for himself and because he knew that he was in trouble. Consequently, the prosecutor did not misconstrue the evidence. Johnson, 238 So. 3d at 739.

The comments by the prosecutor about which Wade complains were not improper, and any improper comment was isolated, ambiguous, and corrected by an instruction by the trial judge. Because Wade fails to demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'" the federal due process claim is without merit. Land, 573 F.3d at 1219 (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). As such, relief on the claim in Ground Two is due to be **DENIED**.

### C. Ground Three

As Ground Three, Wade asserts that trial counsel deficiently performed by not objecting to statements by the prosecutor during closing that allegedly commented on his right to silence. (Doc. 7 at 28–35). Respondents contend that

65

the claim is procedurally defaulted because in his federal petition Wade asserts a violation of his right to not testify and because in state court Wade failed to fairly present a claim based on the violation of the same right. (Doc. 12 at 37–38). However, in the amended petition, Wade contends that he suffered prejudice under Strickland because the prosecutor argued that Wade should have testified at trial to explain his silence for eight days before his arrest. (Doc. 7 at 33). Both Wade's amended motion for post-conviction relief (Doc. 12-8 at 21), and Wade's brief on state post-conviction appeal (Doc. 12-14 at 20–21) presented the same argument. Also, on appeal, the State conceded that the claim presented in Wade's brief was preserved. (Doc. 12-15 at 20). Consequently, the claim is not procedurally defaulted.

Wade contends that trial counsel should have objected to comments by the prosecutor regarding Wade's failure to come forward to the police for eight days following McCoy's death. (Doc. 7 at 29–30). The following portions of the prosecutor's closing argument are relevant to this claim.

> [Prosecutor:]   And then they concoct the story afterward. It's about what he does and sometimes about what he doesn't do. He doesn't come forward. He sits there while her family's wondering what's going on, what happened to her. And he's more than happy to keep it a secret, more

66

than happy to. It's only when he's confronted with the fact that his friends — the people that he had conspired with to keep this a secret, it's only when he's confronted with that fact does he come up with something.

(Doc. 12-3 at 559).

[Prosecutor:]    Day two, does he go to sleep and wake up and say, "This is an accident?" No. What he does on day two is his friends come over. And they concoct this lie, this story.

. . .

Next day, day three, Kalil's body is found. He goes to the scene. He's feet away from where this girl was tragically laid. And what does he do at that point? There [are] people around. Police officers, families there, friends are there. Everybody's there. He can say, this is an accident. Please somebody understand, this was an accident.

Does he choose to do that? No. He goes to the scene, and he just hangs out. He sees how this affected everyone else around him, and that is not [enough] to compel him to say, "This was an accident." So, that's day three.

67

> Day four, nothing. Day five, nothing. Day six, day seven, day eight, nothing.

(Doc. 12-3 at 468–70).

> [Prosecutor:]  So, he goes in blind. He knows they got his truck. He doesn't know what Boogie has said. So, he goes into the interview. And he's sitting across from the detectives, and one of the first things the detective does is say, "What happened to this girl?" Slides out her prom picture, and then he slides out a picture of her in the woods.
>
> Does he say it was an accident then? No. What he says is, "I didn't do that." He looks her dead in the eye and said, "I didn't do that"; "I didn't do that."

(Doc. 12-3 at 475).

The post-conviction court denied the ineffective assistance of counsel claim as follows:

> Defendant alleges counsel failed to object and move for a mistrial when the prosecutor improperly commented on the exercise of his right to remain silent. He cites several comments regarding his failure to come forward and tell everyone that the shooting was an accident. He argues these comments shifted the burden of proof to the defense because "those comments put in the jury['s] mind if it was an accident, why didn't he say so from day one to day eight?"

68

> Where a defendant alleges counsel was ineffective for failing to move for a mistrial, the defendant must show that the motion for mistrial would have been granted to satisfy the prejudice prong of Strickland. Middleton v. State, 41 So. 3d 357, 360 (Fla. 1st DCA 2010). "A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding." Floyd v. State, 913 So. 2d 564, 576 (Fla. 2005).
>
> In this matter, Defendant claimed, in his taped interview with Detectives Gupton and Hinton, that the victim grabbed his hand and put it up to her head with the gun, saying, "Come on, you're going to just kill me," and "Shoot me, shoot me," then the gun went off. Clearly, the defense theory was that the shooting was an accident. The State's arguments challenged that theory, pointing out that Defendant's actions were not consistent with an accident but instead demonstrated the element of ill will needed to support a conviction for second-degree murder. Counsel had no basis to object that the State was commenting on his right to remain silent, and there is no reasonable probability that such an objection would have been sustained. Ultimately, "trial counsel cannot be deemed ineffective for failing to object to arguments that are proper." Rogers v. State, 957 So. 2d 538, 549 (Fla. 2007).

(Doc. 12-8 at 37–38) (state court record citations omitted).

"When a defendant remains silent during an encounter with the police, the legal bases for evaluating whether such evidence or argument is prohibited differs depending on whether the silence occurred before or after arrest and

69

before or after <u>Miranda</u> warnings have been administered." <u>Howard v. State</u>, 288 So. 3d 1239, 1245 (Fla. 2d DCA 2020). "Any evidence or comment on a defendant's post-<u>Miranda</u> silence, whether offered as substantive evidence or as impeachment, is prohibited." <u>Howard</u>, 288 So. 3d at 1245. Also, under article I, section 9 of the Florida Constitution, "(1) a defendant's post-arrest, pre-<u>Miranda</u> silence may not be used either as substantive evidence or for impeachment purposes and [ ] (2) a defendant's pre-arrest, pre-<u>Miranda</u> silence may not be used as substantive evidence but may be used for impeachment if the silence is inconsistent with the defendant's testimony at trial." <u>Howard</u>, 288 So. 3d at 1247 (citations omitted).[7] Notably, Florida courts apply "a very liberal rule for determining whether a comment constitutes a comment on silence:  any comment which is 'fairly susceptible' of being interpreted as a comment on silence will be treated as such." <u>State v. DiGuilio</u>, 491 So. 2d 1129, 1135 (Fla. 1986) (citation omitted).

---

[7] To the extent that Wade contends that trial counsel should have objected based on state constitutional law, the issue of whether such an objection would have succeeded is an issue of state law, and a state court's determination of state law receives deference in federal court. <u>Calhoun v. Warden, Baldwin State Prison</u>, 92 F.4th 1338, 1352 (11th Cir. 2024). <u>See</u> <u>also</u> <u>Urbaniak v. State</u>, 241 So. 3d 963, 966 (Fla. 2d DCA 2018) ("[T]he use of a defendant's prearrest silence is not precluded in federal court unless the defendant first invoked his right to remain silent[.] Under the Florida Constitution, the State may not admit a defendant's prearrest, pre-<u>Miranda</u> silence as substantive evidence of guilt or when the defendant fails to testify.").

70

Because Wade waived his right to remain silent before the questioning, the prosecutor's comments about Wade's failure during the interview to immediately claim that an accident caused McCoy's death were not impermissible. Connor v. State, 979 So. 2d 852, 860 (Fla. 2007) ("Connor freely and knowingly waived his Miranda rights before agreeing to speak with the detectives. He does not contest the validity of the waiver. . . . Under these circumstances, the comments made by these detectives are not susceptible to interpretation as comments on silence."). Moreover, while Wade did not testify at trial, in opening statements, trial counsel told the jury that Wade thought that the gun was unloaded, that the gun unexpectedly discharged, and that what occurred was a "true accident." (Doc. 12-3 at 36–38). On cross-examination, trial counsel elicited from Mahone that, after the gun discharged, Wade repeatedly said that he did not intend to shoot McCoy and that he did not think that the gun was loaded. (Doc. 12-3 at 223–24). During the interview, Wade told the detective that the gun accidentally discharged when he applied the brake on his truck. (Doc. 12-3 at 351–52). "A narrow exception to the rule forbidding a comment on a defendant's failure to testify applies where the prosecution's statement is invited by the defense." Brown v. State, 771 So. 2d 603, 605 (Fla. 4th DCA 2000). Because trial counsel argued

71

in opening statement that the killing was an accident and elicited testimony on cross-examination that supported that defense, the prosecutor was entitled to respond to the defense by arguing that Wade's actions and statements after the shooting were inconsistent with the defense of an accidental shooting. Brown, 771 So. 2d at 605–06 ("In this case, the record shows that defense counsel argued throughout the entire trial that Widder's death was a suicide . . . . In light of those arguments by the defense, we conclude the prosecutor was justified in commenting on the lack of evidence of suicide."); Whigham v. State, 97 So. 3d 274, 276 (Fla. 1st DCA 2012) ("Viewed in context, we do not interpret the prosecutor's statement as a comment on Appellant's right to remain silent. Rather the prosecutor highlighted for the jury the inconsistency between what Appellant told police upon being arrested—that a man named Leroy Thomas shot the victim—and the defense he presented at trial.").

Because an objection to the prosecutor's comments would not have succeeded, trial counsel did not deficiently perform. Consequently, the post-conviction court did not unreasonably deny the claim. Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would

72

not have gotten his client any relief. "). Relief on the claim in Ground Three is due to be **DENIED**.

### D. Ground Four

As Ground Four, Wade asserts that trial counsel deficiently performed by not moving for a mistrial during closing argument because the prosecutor allegedly misstated the law and stated facts not in evidence. (Doc. 7 at 35–40). In his amended motion for post-conviction relief, Wade identified the following comments by the prosecutor as supporting his claim (Doc. 12-8 at 18):

| | |
|---|---|
| [Prosecutor:] | Members of the jury, this is a firearm. It's a gun. This is the ultimate weapon of death. This is a machine created for no other purpose than to take life. Guns have been around for a long time. |
| [Trial counsel:] | I would object to that statement, Judge. |
| [Trial judge:] | Overruled. |
| [Prosecutor:] | Through the course of human history, there have been guns, and over the course of human history, we've gotten better at making guns. We've made them deadlier. We've made them more accurate, invented the rifle, so they'd be more accurate. We invented the automatic pistol. So, we go from single-shot musket that takes five, ten minutes to load. |

73

|  | Then, we get to single-action revolvers, got to pull—cock and pull. |

(Doc. 12-8 at 171).

| [Prosecutor:] | The gun, through the course of human history, has had no other purpose than to kill. That's why we created it. That's what it's used for. It's created out of ill will for others. We don't— |
| [Trial counsel:] | Judge, I'm going to object to this argument as irrelevant, and I'm going to object to this argument as, quite frankly, not being— |
| [Trial judge:] | I'm going to sustain that last objection, the last comment. |
| [Prosecutor:] | So, I want to begin by reading part of [the] instructions that the Court is going to tell you, premeditated first-degree murder. In order to convict of second-degree murder, it is not necessary for the State to prove the defendant had an intent to cause death. |

(Doc. 12-8 at 172).

| [Prosecutor:] | At the top, we have premeditated, cold-blooded murder. You have [to] intend to do that. You have to want that person to die. That is not this case. We don't know whether this defendant, Mr. Wade, intended to kill Kalil McCoy. We don't know |

74

|  |  |
|---|---|
|  | that.  Kennard  Mahone,  Alfred Mears, Jonathan Brooks, Detective Gupton, Detective Hinton, none of them know what was going through that man's mind when he pulled that trigger. |
| [Trial counsel:] | Judge, I'm going to object to who knew    what.    That's    not—the witnesses as to any— |
| [Trial judge:] | Overrule the objection. |
| [Prosecutor:] | Only  Mr.  Wade  knows  what happened. Only Mr. Wade knows why that trigger was pulled. So, we didn't  charge  first-degree  murder because  we  don't  know  why  it happened. |
|  | But the important thing is here we don't have to prove why he did it. We just have to prove that he did it. So, I want to talk to you about that. |

(Doc. 12-8 at 173).

|  |  |
|---|---|
| [Prosecutor:] | Imminently dangerous to another, demonstrating  a  depraved  mind without regard to human life. This is defined as a person of ordinary judgment who would know that it's reasonably  certain  to  kill  or  do serious  bodily  injury  to  another. There is not a single person on this earth that does not know that guns kill people. They do. |

75

Number three, of such a nature, the act itself indicates an indifference to human life. I don't see a situation in which you can point a firearm at another person's head and care about their life. You don't. You don't know what's going to happen.

So—is done from ill will, hatred, spite, or evil intent. Members of the jury, I talked to you about guns. I talked to you about how guns were created from ill will. Their purpose—

[Trial counsel:]    I'm going to again—

[Prosecutor:]    Your Honor, I have case law on this matter. Can we approach?

[Trial judge:]    Come to sidebar.

(The following sidebar conference was had out of the hearing of the jury.)

[Trial judge:]    The argument earlier that I sustained was basically anytime you use—as I understood, anytime you use a gun, it's being used with ill will.

[Prosecutor:]    Yes. I can cite the case.

[Trial judge:]    Well, you need to because I don't think that's true. We use guns all the time without ill will. There's a specific finding that a jury must make to distinguish a shooting from

76

|  | manslaughter or justifiable or excusable [homicide]. There's a difference between the two of them. One of those distinctions is the intent. |
|---|---|
| [Prosecutor:] | Yes, sir. And it's the case that we relied upon in judgment of acquittal. It's <u>Hines versus State</u>, 227 Southern Second 334. Specifically, the essential distinction between first and second-degree murder is the absence of the element of premeditation. The more difficult question is whether the act causing the death evinced a depraved mind [without regard to] human life. |
|  | Depraved mind within the second-degree murder statute has been [ ] defined as importing malice in the sense of ill will, hatred, or evil intent, and an inherent deficiency of moral sense and rectitude. |
|  | It has also been stated that malice is not limited in its meaning— |
| [Trial judge:] | Slow down, Mr. Atkinson. |
| [Prosecutor:] | —is not limited in its meaning to hatred, ill will, and malevolence but denotes a wicked and corrupt disregard of the lives of humans—of others. |
|  | The point in this case is the act of the defendant pointing the gun at |

77

|                    |                                                                                                                                                                                                                                                                                                        |
| ------------------ | -------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                    | the head of the deceased was clearly imminently dangerous to human life.                                                                                                                                                                                                                                |
| [Trial judge:]     | That's a fine argument to make.                                                                                                                                                                                                                                                                         |
| [Prosecutor:]      | Yes, sir.                                                                                                                                                                                                                                                                                               |
| [Trial judge:]     | I don't have any issues with that. What I have an issue with is that whenever you use a gun, it's ill will. That is not—that's not true. Or every shooting would be no less than a second-degree murder. I don't think that's—that cannot be true because then why would we have manslaughter when there is a firearm being used? It would automatically— |
| [Prosecutor:]      | Your Honor, it is the—                                                                                                                                                                                                                                                                                  |
| [Trial judge:]     | You need to stay—I'm going to make a decision, so we can continue on.                                                                                                                                                                                                                                   |
| [Prosecutor:]      | May I cite the Manuel case?                                                                                                                                                                                                                                                                             |
| [Trial judge:]     | Go ahead.                                                                                                                                                                                                                                                                                               |
| [Prosecutor:]      | It's 344 Southern Second 1317. It's a 1977 case, Manuel versus State. It's a Second District Court of Appeals case in which they distinguish the varying levels of first-degree, second-degree, and manslaughter. And the distinguishing marks they make are basically, including the Hines case and Dellinger case, and |

78

|  | going through the cases, specifically say that the act of pointing a handgun at another person's vital organ is what causes ill will. |
|---|---|
| [Trial judge:] | Keep that voice down. |
| [Prosecutor:] | Yes, sir. So, specifically in this case, pointing a loaded handgun at her head is by itself ill will, without any other finding. And again— |
| [Trial judge:] | Let me see it. |
| [Prosecutor:] | Yes, sir. |
| [Trial counsel:] | And, Judge, if I could just point out, I think these are cases where they're saying, yes, like, you shouldn't have granted a [judgment of acquittal] or—it's still a jury question. It's not, by definition, malice. That's for a jury to decide. |
| [Prosecutor:] | They can decide that pointing a firearm at a person's head is malice and I'm allowed to argue that. Well, they may not, but I'm allowed to argue it legally. |
| [Trial judge:] | The question presented is whether or not the State should be allowed to argue that pointing a gun at somebody's head in these circumstances is evidence of ill will.

You say it's not. You say it can be. |

79

[Prosecutor:]        Yes, sir.

[Trial counsel:]     And specifically, I think it's the way it's said. I'm not saying that you can't argue to the jury this.

[Trial judge:]       Yeah. I think—

[Trial counsel:]     You can't say these guns, when they made these guns, they—

[Prosecutor:]        You keep objecting before I get to my argument, Mr. Andux.

[Trial judge:]       Don't talk over one another, please. Here's my ruling. Listen carefully.

[Prosecutor:]        Yes, sir.

[Trial judge:]       You can argue it is ill will to point a gun in this case in the manner in which it was done. And you can argue that it wasn't. The jury will decide.

[Prosecutor:]        Yes, sir.

[Trial judge:]       Earlier you gave me the impression that these guns are all—whatever the circumstance is, no matter what it is, it's always ill will. That I don't think is—I don't want this jury to think that's the status of the law because it's not.

                     You can certainly argue—and I'm going to allow him to argue passionately, if he wishes, that this

80

> was ill will, the way he pointed this gun at her. I think that's legitimate argument.
>
> And I read that case that you cited to me, 344 Southern Second 1317. It cites me the cases. I think it's legitimate argument from what I read. It's not [judgment of acquittal] issues either. It's facts of the case.

[Prosecutor:]     Your Honor, at this point, I would ask that you overrule the objection on the record because Mr. Andux keeps giving the impression that I'm arguing illegal facts in front of the jury.

[Trial judge:]     I will overrule the defense's objection.

[Prosecutor:]     Thank you.

[Trial counsel:]     Judge, I would ask—if I can just say this, my objection—

[Trial judge:]     We're done. Let's keep going.

(Doc. 12-3 at 479–85).

The post-conviction court denied the ineffective assistance of counsel claim as follows:

> Defendant alleges counsel failed to move for a mistrial based on the prosecutor's improper closing argument. He acknowledges that counsel objected when the

81

prosecutor said guns were "the ultimate weapon of death . . . created specifically to kill," but the objection was overruled. He notes that counsel objected eleven times during the State's initial closing and twice during the rebuttal closing. Defendant maintains that the State diminished the burden of proof by arguing that possession of a firearm alone was sufficient to establish the element of ill will, and counsel's failure to object prevented a fair trial and hindered his appeal.

This claim [ ] lacks merit. This Court recognizes that "it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt." Gore v. State, 719 So. 2d 1197, 1200 (Fla. 1998). However, a prosecutor's comments are not improper if they are an invited response to an argument made by the defendant. Scott v. State, 66 So. 3d 923, 930 (Fla. 2011). The State is permitted to point out a lack of evidence to support an alternative theory of the case put forth by the defense. Id.; see also Cannon v. State, 45 Fla. L. Weekly S68 (Fla. Feb. 13, 2020).

Moreover, as to the merits of the comments at issue, the proper method for reviewing the effect and prejudice of the prosecutor's comments is to place them in context. Rose v. State, 985 So. 2d 500, 508 (Fla. 2008); Ham v. State, 580 So. 2d 868, 868 (Fla. 3d DCA 1991). Attorneys are allowed wide latitude to argue to the jury during closing argument. Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982). Attorneys may also draw logical inferences and advance legitimate arguments in their closing statements. Thomas v. State, 748 So. 2d 970, 984 (Fla. 1999). The prosecutor is permitted to make comments that stem from evidence admitted at trial or that which may be "reasonably inferred from the evidence."

82

Ford v. State, 702 So. 2d 279, 280 (Fla. 4th DCA 1997) (citing Huff v. State, 437 So. 2d 1087, 1090 (Fla. 1983)); see Merck v. State, 975 So. 2d 1054, 1064 (Fla. 2007) (finding no impropriety in prosecutor's comments based on facts in evidence and common-sense inferences from those facts); McKenzie v. State, 830 So. 2d 234, 238 (Fla. 4th DCA 2002) ("While recognizing that wide latitude should be permitted in closing argument, a prosecutor's comments must be based on facts in evidence or fair inference from those facts."). Moreover, attorneys should suggest what conclusions the jury can draw from the evidence. Valentine v. State, 98 So. 3d 44, 55, 56 (Fla. 2012); see Ruiz v. State, 743 So. 2d 1, 4 (Fla. 1999) (explaining counsel must not "obscure the jury's view with personal opinion, emotion, and non-record evidence").

In the instant case, counsel had moved for a judgment of acquittal, arguing: "there was no testimony of hatred, ill will, or spite," Defendant and the victim loved each other, and the argument between them was not serious, as their friends had seen them argue like that many times. He also argued there was testimony that Defendant did not believe the gun was loaded. In response, the State argued "it took some degree of thought to shoot the trigger or pull the trigger," and cited case law holding that the act of pointing a firearm at someone could evince hatred or ill will. The State's subsequent closing argument built on this position. It was not an attempt to shift the burden of proof; instead, it was an invited response to Defendant's assertion that there was no ill will between himself and the victim.

Furthermore, the State's characterization of guns did not merit a mistrial. "[W]ide latitude is permitted in presenting opening and closing statements to a jury, and comments by the prosecutor will merit a mistrial

83

only when they deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered." Miller v. State, 161 So. 3d 354, 382 (Fla. 2015).

Finally, the State's closing also constituted fair comment on the evidence presented by the eyewitnesses. Alfred Mears testified that Defendant and the victim were "yelling and arguing back and forth," then he saw Defendant pointing a gun at the victim, and the gun went off. He did not think Defendant was trying to kill the victim, but Defendant was "pointing the gun and messing around." Jonathan Brooks also testified that Defendant and the victim were arguing, and at some point, Defendant drew the firearm, which was discharged, striking the victim. Finally, Kennard Mahone testified that Defendant and the victim were arguing, and the victim was getting louder. He saw a gun in Defendant's hand and Defendant was "playing with it," toward the victim. The gun fired, striking the victim in the head from a distance of a little over a foot.

The State was entitled to argue that the evidence supported its theory of the case, and its closing was not improper, [and did not] merit a mistrial. Based on the foregoing, there is no reasonable probability that the Court would have granted a motion for mistrial based on the prosecutor's closing argument, which advanced the State's position that the shooting was not accidental. Thus, Defendant is not entitled to relief on this ground.

84

(Doc. 12-8 at 35–37) (state court record citations omitted). The state appellate court affirmed the denial. (Doc. 12-17 at 3).

Whether the prosecutor's comments were improper is an issue of state law, and a state court's determination of state law receives deference in federal court. Calhoun, 92 F.4th at 1352 ("[T]he source of absolute deference to state supreme courts on state law issues . . . is grounded [ ] in fundamental tenets of federalism and the dichotomy of state and federal law that shapes our federal-state system. And it is compelled by the dozen or so decisions of the Supreme Court and this Court[.]"). After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Wade is not entitled to relief on the basis of this claim.

Regardless, even without deference, the claim is without merit. Second-degree murder requires evidence that "there was an unlawful killing of the victim by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life." Morrison v. State, 288 So. 3d

85

704, 706 (Fla. 4th DCA 2019). Because pointing a loaded gun at another person's head and pulling a trigger constitutes an imminently dangerous act and demonstrates a depraved mind, the prosecutor did not impermissibly argue that Wade's actions proved that he committed second-degree murder. (Doc. 12-3 at 479–85). Manuel v. State, 344 So. 2d 1317, 1320 (Fla. 2d DCA 1977) ("In Edwards v. State, 302 So. 2d 479 (Fla. 3d DCA 1974), the court found that the act of the defendant in pointing his gun at the victim's head, waiting until the victim had taken three steps backward, and then firing the gun, to be both depraved and imminently dangerous."). Also, "because no degree of murder below first-degree murder is a specific intent crime[,] [t]he crime of second-degree murder requires the proof of no more than a general intent to commit the imminently dangerous act which results in the unlawful killing." Gentry v. State, 422 So. 2d 1072, 1073 (Fla. 2d DCA 1982). Consequently, the prosecutor did not impermissibly argue that he did not have to either prove that Wade intended to kill McCoy or demonstrate "what was going through [Wade's] mind when he pulled [the] trigger." (Doc. 12-8 at 173).

Even if the prosecutor's comment that a gun is "created out of ill will" (Docs. 12-3 at 479 and 12-8 at 172) misstated the law, a motion for mistrial would not have succeeded. The trial judge sustained trial counsel's first

86

objection (Doc. 12-8 at 172) and overruled the second objection at a sidebar conference. (Doc. 12-3 at 484) During the sidebar conference, the trial judge prohibited the prosecutor from arguing that evidence that a defendant used a gun to kill a victim presumptively proves ill will. (Doc. 12-3 at 485–86). After the sidebar conference, the prosecutor explained why the evidence proved that Wade acted with ill will when he shot and killed McCoy. (Doc. 12-3 at 486–87). During rebuttal, the prosecutor continued to comply with the trial judge's ruling. (Doc. 12-3 at 560–63).

As previously noted, before closing argument, the trial judge instructed the jury that a statement by an attorney is not an instruction on the law and that the jury would receive instructions on the law after closing argument. (Doc. 12-3 at 454–55). After closing argument, the trial judge twice instructed that the jury must follow the law defined in the instructions. (Doc. 12-3 at 592, 599). Also, the trial judge instructed that the defense of excusable homicide applied to second-degree murder and correctly defined excusable homicide. (Doc. 12-3 at 579–80). A federal habeas court presumes that the jury followed the trial judge's instructions. Brown, 255 F.3d at 1280.

Additionally, even if the prosecutor misstated the law, the trial judge sufficiently cured any misstatement by both limiting the prosecutor's

argument and correctly instructing the jury on excusable homicide. Because Wade cannot demonstrate that a motion for a mistrial would have succeeded, trial counsel did not deficiently perform. Consequently, the post-conviction court did not unreasonably deny the claim as it is without merit. Pinkney, 876 F.3d at 1297. Joseph v. State, 336 So. 3d 218, 241 (Fla. 2022) ("'A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial. In other words, [a] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial.'") (citation omitted). Relief on the claim in Ground Four is due to be **DENIED**.

### E. Ground Five

As Ground Five, Wade asserts that trial counsel deficiently performed by not objecting to a statement by the detective during the interview that allegedly disclosed prior criminal conduct by Wade. (Doc. 7 at 40–46). The post-conviction court denied the claim as follows:

> Defendant alleges counsel failed to object to parts of the taped interview that implied he had a history of arrest. In support, he cites the following statement made by the detective in the interrogation room, which was played for the jury and appears on page 522 of the trial transcript:

> [Detective:]   Look, I can't promise you one way or the other. That's not my job. I have no authority over that. You know

88

that; you've been around the legal system enough.

Defendant argues this statement implied that he knew by experience what the detective was capable of giving him and that he had a criminal history. He further argues that counsel failed to object to inadmissible evidence of other bad acts or wrongs and to request a Williams[1] rule hearing before such evidence was admitted.

> [1] Williams v. State, 110 So. 2d 654 (Fla. 1959); codified in § 90.404(2)(a), Fla. Stat.

This claim lacks merit. The statement "you've been around the legal system enough" did not constitute a clear assertion that Defendant had a criminal record. In the alternative, it was isolated; there were no further references to Defendant's prior contacts with the criminal justice system during the interrogation, which covers fifty-eight pages of the trial transcript. Therefore, he cannot establish that he was prejudiced by counsel's failure to object to this single statement. Furthermore, counsel had no basis to request a Williams rule hearing because the State was not seeking to admit evidence of other crimes, wrongs, or acts under Section 90.404(2)(a), Florida Statutes. Thus, counsel cannot be deficient for failing to seek a Williams rule hearing in this matter.

(Doc. 12-8 at 32–33) (state court record citations omitted).

As an initial matter, the Court observes that whether the detective's statement was evidence of a crime, wrong, or act under § 90.404(2), Florida Statutes, and whether the detective's statement was admissible at trial are

89

issues of state law, and, as such, the state court's determination of this state law issue receives deference in federal court. Calhoun, 92 F.4th at 1352. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Wade is not entitled to relief on the basis of this claim. And regardless, Wade's assertion of deficient performance is unavailing.

As relevant to this claim, Florida Statute section 90.404(2), which codifies the holding in Williams v. State, 110 So. 2d 654 (Fla. 1959), authorizes the admission of "[s]imilar fact evidence of other crimes, wrongs, or acts [ ] when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The statute also prohibits the admission of such evidence "when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla. Stat. Applying section 90.404(a)(2), "[the Florida supreme court] has held that before admitting collateral crime evidence, the trial court must make four determinations: whether there is

90

sufficient evidence that defendant committed the collateral crime; whether the collateral crime meets the similarity requirements necessary to be relevant; whether the collateral crime is too remote, so as to diminish its relevance; and whether the prejudicial effect of the collateral crime substantially outweighs its probative value." Peterson v. State, 2 So. 3d 146, 153 (Fla. 2009). "[A court] considers both similarities and dissimilarities between the collateral crimes and the charged offense when reviewing whether 'a sufficiently unique pattern of criminal activity [justifies] admission.'" Peterson, 2 So. 3d at 153 (citation omitted). However, here the State did not seek to present collateral crime evidence. Indeed, the detective's statement that "you've been around the legal system enough," is too vague and ambiguous to demonstrate any similarity between the charged murder and any other crime, wrong, or act, and therefore section 90.404(2)(a) does not apply. Because an objection based on section 90.404(2)(a) would not succeed, trial counsel did not deficiently perform. Pinkney, 876 F.3d at 1297.

Also, the detective did not specifically refer to either a prior arrest or a prior conviction. The detective simply referred to Wade's exposure to the legal system. And the detective did not repeat the statement or make any more specific comment about a prior arrest or a prior conviction. Also, the prosecutor

91

did not argue in closing that the detective's comment about Wade's exposure to the legal system demonstrated that Wade had a propensity to commit crime. Wade simply fails to show that this fleeting comment impacted the trial in any way.

The State's case against Wade was strong. Notably, Wade's statements during the interview were compelling evidence of his guilt. During the interview, Wade admitted that he was holding the gun in his hand, when the gun discharged and fatally shot McCoy in the head. (Doc. 12-3 at 351–52). He admitted that, after McCoy suffered a fatal gunshot wound, he did not drive to the hospital and instead drove to a home where he used to live. (Doc. 12-3 at 352). He said that he sat in his truck, while his friends dumped McCoy's body near the home (Doc. 12-3 at 360–61) and cleaned the front passenger seat. (Doc. 12-3 at 365–66). He said all of this despite the fact that when Wade first spoke with the detective, he denied killing McCoy and denied knowing how she died. (Doc. 12-3 at 303–04). Wade claimed that, that evening, he went home and went to sleep. (Doc. 12-3 at 292–94). Also, Wade claimed that Mahone borrowed his truck that evening. (Doc. 12-3 at 304–05). Wade's inconsistent statements significantly undermined his credibility. § 90.806(1), Fla. Stat. ("When a hearsay statement has been admitted in evidence, credibility of the declarant

92

may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness."); Pearce v. State, 880 So. 2d 561, 569 (Fla. 2004) ("The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements."). And Wade's complicity in the cover up of the murder and creation of a false narrative were compelling evidence of his consciousness of guilt. Bogart v. State, 114 So. 3d 316, 318 (Fla. 4th DCA 2013) ("[A]ppellant's actions of selling the victim's phone and his efforts to conceal the body, as well as his refusal to call 911 or the police were relevant for the jury to infer consciousness of guilt.") (citing Straight v. State, 397 So. 2d 903, 908 (Fla. 1981)).

On this record Wade cannot demonstrate a reasonable probability that the trial judge would have granted a motion for a mistrial, instead of giving the jury a curative instruction, or that the outcome at trial would have changed. Consequently, the post-conviction court did not unreasonably deny relief on this claim. Strickland, 466 U.S. at 694. Joseph, 336 So. 3d at 241 ("'[A] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial.'") (citation omitted). Ibar v. State, 938 So. 2d 451, 471

93

(Fla. 2006) (holding that a motion for mistrial would not have succeeded because a detective's reference to "money and drugs" was not evidence of a crime, wrong, or act and because the reference was "sufficiently vague"). For these reasons, relief on the claim in Ground Five is due to be **DENIED**.

### VII. Certificate of Appealability
### Pursuant to 28 U.S.C. § 2253(c)(1)

If Wade seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Wade "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

94

See <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u> Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Amended Petition (Doc. 7) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.      If Wade appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

95

4.     The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 26th day of March, 2026.

**MARCIA MORALES HOWARD**
Chief United States District Judge

cc:     Frederick Lee Wade, #J47680
        Counsel of Record

96